All right. Mr. Bylund? Yes, good morning, Your Honors. Good morning. Jeremy Bylund on behalf of PointClickCare. Your Honors, over 1.6 million nursing home residents in North America rely on my client's medical software being safe, secure, and available. And that's why my clients have had a longstanding contractual prohibition that predates this dispute that prohibits the use of automated bots on a system. And that's because those bots can crash the system, which can cause life-threatening issues for the nursing home patients. Mr. Bylund, I'm going to have some questions about your client's bot policy, but I have some questions, unfortunately, before that. Sure. You're the party that removed this case, right? Yes, Your Honor. What's the basis of federal subject matter jurisdiction? Diversity jurisdiction. Okay, because you agree it's not arising under – so the notice of removal cites both arising under and diversity. And it's clearly not arising under because the CARES Act doesn't create a cause of action and because the Declaratory Judgment Act doesn't create federal subject matter jurisdiction, right? So the complaint, as filed in the state court, tried to bring a cause of action under the CARES Act. And so we agree with you that there's not a right of action under the CARES Act. But because the original complaint had that cause of action, which has now been – well, it's been abandoned. Okay, so at the time of your notice of removal, you alleged that the other side was an LLC, right? That may be the case, Your Honor. Real-time medical systems – well, no. So their complaint says you alleged they were an LLC, I'm pretty sure. And you said you were unaware of the citizenship of all their members, which matters because LLCs take on the citizenship of all their members, right? Yes, Your Honor. Okay. Did you ever become aware of the identity of their members? I have not, Your Honor. Does that mean you failed to establish the existence of complete diversity? I'll get back to you on that one, Rebuttal, if you don't mind, Your Honor.  The only thing I'd like you to get back to me on, Rebuttal, too, is some of the filings refer to them as real-time medical systems, inc. So corporations are the state of – I mean, I'm standing here. I believe they're in a corporation, but I want to get back to you. Okay, I appreciate it. Thank you. No, I appreciate that. So on the bot policy, I have just a question literally from reading the briefs that I don't understand. Okay. Your client has always had an anti-bot policy, right? It has had – yes, a contractual policy. Between 2014 and 2022, did you do a single thing about their use of bots? Between which dates, Your Honor? 2014 and 2022. Yes, we did, Your Honor. We integrate – or we dialogue with our customers that were using bots in our system and encourage them to not allow bots on their system, and that proved ineffective, and that's why we started implementing CAPTCHAs in 2022. Okay, so it's always been against – okay. Because it just seems – we have a policy against bots. You can't use bots. Everyone's been using bots for years, but then in 2022, we all of a sudden started using these CAPTCHAs. So there were actions taken, Your Honor. So there's been like this cat and mouse game that's been going on for years. So it started with dialogue with our customers. Then it moved to CAPTCHAs, and then the opponents had a full-time employee whose whole job was to defeat those CAPTCHAs, and so the CAPTCHAs proved ineffective. We then implemented more effective CAPTCHAs, and that's when the preliminary injunction motion was brought. Okay, so one more framing question before we get to the district court. So as I understand it, there's a lot of talk about these exceptions, right? But these exceptions only apply once we have information blocking, right? There's a prohibition on information blocking and then says you can information block in certain exceptions, right? Yes, Your Honor. And I read your brief as arguing the exception – Well, can I take to the whole issue? Please, of course. The exceptions say that's not information. Sorry, not information. They carve out sort of like rule 801 of the Federal Rules of Evidence says, here's certain things that are hearsay, and then here's a bunch of things that would otherwise be hearsay that are now not hearsay. Okay. So you've never argued – you've only argued the exceptions. You've never argued that absent the exceptions, this wouldn't be information blocking. Correct. Okay. Thank you. So, but I guess – and this gets to the burden of proof argument, which I'll get to. I don't know that that matters. No, I'm just trying to frame what is in front of us and what's not. Right. So I wanted to just first start with the misinterpretation of the Cures Act by the district court. So the injunction prohibiting us from blocking bots, prohibiting us from enforcing our contractual prohibition is based on a misreading of the Cures Act. And I think that's most evident in the interpretation of the manner exception. So in the manner exception, when you have a nonstandardized request for access like we have here, what the manner exception provides is if the parties can't come to a mutually agreeable terms, then my client can offer two federally recognized alternatives. And if we provide two federally recognized alternatives, then we have satisfied the Cures Act. But you used the manner exception for the bot. And the district court seemed to have been pointing to that data export as a basis by which they could also come there. And that was something they offered. How do we get there? I mean, when we look at it from the proper manner in which it's requested in this instance. So if it didn't come together, how do we get to the agreement business? So if your honor is asking about the request for a data export in CSV by RTMS, is that what you're referencing? That doesn't actually – that's also nonstandard. So it's not part of 170. Part of 170 has very detailed specifications by the federal government about content, about manner, and that CVS export is also nonstandard. So the bots are nonstandard. The CVS export is nonstandard. So the question is, what happens when we receive nonstandard requests? The Cures Act says that if we receive nonstandardized requests and we don't come to mutually agreeable terms with the other party, then we can provide the federally recognized alternatives. And the error by the district court was by not letting us get into that exception by saying that we were merely unwilling and not unable to come to mutually agreeable terms. So part of what's going on in this case is there's these three exceptions. You know, everyone's debating. And I look at these three exceptions. It would be helpful for me, and I'm going to posit that these exceptions can overlap and that they have overlapping concerns, but like at a really high level of generality, could you tell me what you think of as the big picture idea behind each of the three exceptions that are at issue in this case? Like, what are these trying to get at? So the manner exception is trying to get at favoring interoperability and scalability against bespoke solutions for every request that comes in the door. And no one has said that pretty explicitly in their 2024 rule. And so the equivalent here is like a statute like FOIA where the requester says, not only would I like this information, but I'd like this information in this hyper-specific way that I want. And the government agency says, like, but I don't keep the information in that form, and I shouldn't have to create a form that doesn't currently exist just to help you? Correct. Okay, it's that kind of provision. And ONC explicitly in its final rule favored interoperability and scalability with the federal standards and disfavors the bespoke solution. I think the IT health exception is ensuring that when you have hits that are coming in on your system, that you have the flexibility to cut off that access so it doesn't degrade your system. And is this IT or safety that says, like, you can take your system offline for a while if you need to do maintenance, and people can't argue that violates it? IT health. That's IT health, okay. And then there's security that says that if you have a – there's two ways it's a security exception. If you have a generally applicable policy or if you have a specific security finding that you have a security threat, that you have the flexibility to address that security. So that's just about security threats qua security threats? Yes. Okay. So – but I think the court doesn't have to look further than the legal misinterpretation of the manner exception because that actually is, like, fatal to the whole case because – No, I understand. I'm just trying to – because interpreting the individual exceptions, at least I found it important to think about, like, what are each of these trying to do? Right. Okay. Thank you. Yeah. And I think that on the manner – back to the manner exception, in January 2024 when ONC issued this final rule, it clarified the fact that they wanted to reduce uncertainty in the manner exception. They wanted to make sure that if you were providing the alternatives, that you had the certainty that you were complying with the law. And that's the problem we have here is this is creating uncertainty, right, because in the record we have an exchange of contracts, we have merger discussions, and yet the court below puts a thumb on the scale in favor of RTMS and says, no, you didn't try to come to mutual agreeable terms. But mutually agreeable terms mean they have to be agreeable to both parties. So we think that that's legal error. So the legal error is saying unreasonable – what the district court viewed as unreasonable failure to agree does not preclude a determination that the parties have been unable to reach mutually acceptable terms. Correct. When you have a nonstandardized request for access, I don't think that there's any good faith requirement or anything of that nature. If the parties are unable to come to an agreement, you can use the alternatives. And I think it's supposed to be streamlined. It's supposed to have certainty so that the system will work. I'm bringing it back to the bot distinction I brought up, and you gave me an answer on it, and I've just been reflecting on it and trying to understand. Because the rule is pretty broad. It says, you know, you request something, and if you then look to see if it's something that you can implement, you can do, you need to be agreeable on it. But your witnesses didn't even talk about this. I mean, they didn't really get into whether or not it would be agreeable. And so the question really is, why isn't it a proper manner requested for which the parties should be able to reach an agreement? Not that you did or not that you want to. You're able to do it. And that's really the conundrum, I think, at least insofar as when you're talking about the manner requested exception. How does that differentiate out? Because if they say, we can do this with the data export method, okay, not bot. If we stay with bot, you know, that's not a problem. They backed away from that. But then once they get into the data export method, the question then becomes, well, don't you have to say you can't or you're not able to do it? I mean, don't your witnesses at least need to address, is this a way in which we can have an agreement? Your Honor, so there's two different ways into the manner exception. One is whether you can't do it. It's infeasibility. And the other is whether you're agreeable to it. So the trial court conflated those two. There's two different avenues. So we don't have to show that we're unable to do it. We just have to show that it's not agreeable to us to do it. To answer your question as to whether we engage in negotiations, our witness did talk about the extension negotiations and talk about the terms that were not agreeable to our client, including putting back into the contract the requirement that they be able to use bots and then also knocking down the price to half of what we requested. So the language you're referring to, and I'm looking here trying to see what it is, it says unless the actor is technically unable to fulfill the request or cannot reach an agreeable term with the requester to fulfill the request, and you're differentiating that. Well, I'm dealing with that one you're talking about, the one where you say you are unable to do it. And if you are unable to do it and they say here's something, don't you need a witness to say it's not something you're able to do, at least in terms of unable, but then cannot reach the term, which is what you want to go and say you cannot reach the term. Cannot doesn't mean you don't want to reach the term. It means you just, I guess it's sort of the same thing in some ways. You're not able to do it. It cannot just be I cannot reach it because we just won't agree. Your Honor, so I guess I have a couple of responses. I think the word agreeable terms has meaning. It has to be agreeable. And if it's not agreeable to my client, then it's not agreeable. And I think the problem with that interpretation is it's conflating the inability to do it, which is infeasibility. So it can be a subjective determination, that if it's not agreeable to your client, that's enough to create that exception there. I think that's right. And if you look at ONC's rule, so this is 89 Federal Register at 1382, what ONC says is when you have these non-standardized requests that come in, the EHI platform doesn't have to agree to it. They can provide the alternatives. And they wanted to give certainty and make sure that there is the EHI platform, when they've offered those alternatives, knows that they've satisfied that. And that's 171-204. Now the district court said, explicitly said, you chose to end those discussions. Is that clear error? What's clear error is the legally inaccurate premise that being unwilling doesn't get you into the manner exception. But when the district court makes a determination that you chose to end those discussions, is that determination by the district court clear error? That factual determination is, I guess we're not contesting that determination, but what our witnesses said is that the terms were unagreeable because, and back to your point, the reason they were unagreeable is because the bots were unacceptable. And so what they requested was unacceptable to us. And the injunction, to be clear, requires us to allow the bots on our system. So that's what we're here contesting is that requirement that we provide the bots. If the injunction were something else that we provide some other sort of data, we'd be arguing about that. And that took care of the bots, but what about the data export? The data export doesn't fall under the Act because it's not Part 170 compliant. So it's not a secure way to. So ONC says if it's nonstandard, you don't have to do that. You can provide this standardized secure alternative, and we offered to provide at least three of those alternatives. Taking a step back, I just wanted to note that the Cures Act can't be a predicate for these state law causes of action in the first place. And that's true as a matter of Maryland case law. We cite the Waypoint case to you where there's not a single Maryland case that allows a federal statute that doesn't have a prior override of action to be used as a predicate. We also cited the restatement, and this Court's precedence on. . . Out of the Maryland, I think I know the answer to this question, but it is my sense that the Maryland courts have never cited that restatement. Do you have any case that disagrees with that belief? Your Honor, it's not on our brief, but I did find an appellate Maryland court that did cite the restatement. That cites the third restatement? That cites the restatement cited in your brief? So I'm not. . . I think it was the second restatement, not the third statement. Sorry, the restatement that's cited in your brief, has that ever been cited by Maryland courts? Not that I'm aware of, but it is what the trial court bases her opinion on, and she misinterpreted it. And as we read it, it doesn't support her position. It supports the opposite position. And the last thing I would like to say is the court fundamentally misapplied the burden of proof. I think this kind of goes to your question earlier, Your Honor. When you have a general prohibition like this, where everyone lives in the carve-outs, and then you try to filter that through state law causes of action, that means that the other party should bear the burden the whole time and there shouldn't be any burden shifted. And the Supreme Court just heard last week Cummingham v. Cornell. It talks about ERISA. It's a very similar case, and this is also happening in the drug compounding cases. All the pharmaceutical companies are getting dumped out on motions to dismiss. So with that, Your Honor, I'll get back to you on rebuttal on the LLC questions.  Any further questions? Thank you, Mr. Belmont. Ms. Bruce. May it please the Court, I think it's still morning, maybe not, maybe afternoon. Good afternoon, Your Honor. Good afternoon. I made it to lunch. I stand between you and the end of the day, so... Ms. Bruce, before you start, can I just ask you the question that's confusing? I'm looking at your state court complaint. Sure. The caption says, Real-Time Medical Systems, Inc. And then I turned to paragraph 9 of your complaint, and it says, Plaintiff Real-Time Medical Systems, LLC. Which one is it? I agree with you. So my client is here, and I asked her, when you asked to counsel that question, she says it's an LLC. Okay. We do not have anyone who lives in Canada. This PCC is Canadian. Or abroad. Or abroad.  No. No abroad. No Canada, no abroad. Super. So does that answer your question, Your Honor? It does, thank you. Sorry for the confusion, but we didn't contest jurisdiction when it was removed to the federal court because of the diversity of citizenship. We looked at that and didn't think it was worth our time to fight over whether or not there was a federal question. We do not believe there is a federal question that is implicated here. We believe we're only in federal court because of diversity of jurisdiction. Got it. Thank you. With that, Your Honor, I'd like to start with the question that you asked, if you don't mind me answering that. What is the overarching broad reason for these exceptions? And that is, the overarching broad reason for this entire act as it relates to electronic health records and health records is interoperability, right? How do we get information to flow between health care providers, hospitals, skilled nursing facilities, anyone who provides health care to these individuals, vulnerable individuals who need this care and treatment? My client is part of the health care team. We're not an outsider. We're not a stranger. We're part of the health care team. We are trying to get medical records that the patient has when it's in these particular nursing facilities, these skilled nursing facilities. We're trying to get that information so that we can help the skilled nursing facilities provide care to its patients. It's not particularly complicated. So the whole point of this is how do we exchange data? When we went from paper records, I could take the paper record, hand it to you, Judge, you'd look at it, you'd hand it to Judge Gregory, hand it to Judge Wynn, everybody's looking at the same paper record. Now, all that information exists in a cloud somewhere in a server farm, possibly in Virginia, Judge, possibly out of California, we're not sure, but it exists somewhere in the cloud. And it doesn't look like the medical record anymore. So that chart that used to sit at the end of your bed no longer exists in space. It exists as data points in spreadsheets, in Excel sheets, in thousands and thousands of pieces of information that have to be brought together. So you were getting this information using these bots, which just seemed to be an efficient way to do it. And then apparently, oversimplifying, the complaints come, and then you back off. And you sort of cut your time in half of how much you're going to do it, and then you continue to back off. And I alluded to the fact you brought up this data export as an alternative. We did. To do it. And, you know, so you answered the question of the three exceptions, which really looks to me like maybe where you're going is those are really narrow, that the overarching purpose is for the exchange of information on it. And it seems as though counsel on the other side has really zeroed in on the manner requested exception. And I asked the questions about, well, it looks to me that they were focused on bot, but you say data export is a way to do it, and I couldn't find the witnesses from their side to say it's not agreeable. Is that really an issue in this case, as to whether that contention is something that you would press insofar as whether this was something that they, he differentiated between unable to agree and cannot agree, which I guess takes, from his tenet, takes on a subjective tone. I'm not sure I totally agree with that, but it's, you know, made sense. So how do you respond to that? So let me see if I can understand your question. I want to make sure I'm answering it. Well, let's go to the bottom, the last, make it simple, the last part. Is it something that met that exception because it cannot, it could not be agreeable? It was not agreeable. So the short answer is counsel is incorrect. The manner exception is not applied the way that PCC wants it applied. It is not applied that way. And here's why we know that. PCC wants to use the manner exception to say we can control content. That's what they're doing. They dress it up and they make it sound like something else, but what they're really telling you, Judge, is they want to control the content of what my client can have that's part of the electronic health patient's record. Well, no, hold on. That's obviously false. They're saying you can get any record you want from us. You just have to have a human being do it. I don't care what records you want. If you want oncology records, if you want asthma records, if you want records for this person, you're allowed to get any record about anyone. You just can't use bots to do it. That's not about the content of what they're trying to get. It is when you put it in terms of using the bots. Absolutely it is. So, Judge, let me, again, if I can answer. I guess what I'll say, let's take a record. Here's a piece of paper. Sure. They say you can get this piece of paper. No one is saying you can't get this piece of paper, and what's written on this piece of paper is utterly irrelevant to your ability to get this piece of paper. You just have to do it yourself. You can't use a bot. Okay. How is that content-based? Where does it say that in the manner exception that I have to sit there with 700 people every day for 24 hours a day to pull down information that's in an electronic health record that you maintain in an electronic format that you won't let me have because I'm your competitor? Sure. There may be good reasons why they shouldn't be able to do that. I guess what I was reacting to was how that is in any way content-based. Because it's content-based because the way they want to give me the information is only certain content. Okay. Well, let's pause it. I just disagree about that. Can I ask you a different question that's been bothering the hackademy about this case?  Do you want me to answer Judge Wynn's question first? I'm sorry. I'm sorry. I thought you might. I apologize. Go ahead, Judge. No, go ahead. I'm going to switch topics.  Just you, please. Do you want me to? Yes, please. Okay. If I can get back to I think where you were going, Judge Wynn, is at bottom the manner exception says you have to provide the information in a way that you can provide the information. Right? So the manner in which you provide information is not content, Judge Hayden. It is manner. How do I get it to you? Do I get it to you through a data export? Do I get it to you through some other magical file way that the government has come up with? What PCC wants to do is jump over all that and not talk about whether they can or they cannot provide it in the manner we requested and get to the, but we have to agree to it. Well, in fairness, the reg has written the disjunctive. The reg has written the disjunctive. You have to agree to it or you can't reach agreeable terms to do it. Okay. Those are disjunctive options. Understood. But you can't jump over the way that you give it to me and get to the, we just won't agree with you because you're a competitor. We don't want to give you the information. Okay. So, again, the thing that has been bothering the heck out of me since I've read all the briefs in this case. So your brief on page 12 refers to the authorized automated users. Authorized by whom? The skilled nursing facility through its agreement with the patient. Okay, but the skilled, hold on, but the skilled nursing facility has a contract with PCC, right? Yes. And when your client accesses that information, it is doing so essentially as an agent of or on behalf of the skilled nursing facility, right? We are a BAA, a business associate. We operate under a business associate agreement, which is under HIPAA, which is. Okay. So you have no legal right to access that information except that it's derivative of that at the skilled nursing facility, right? Yes. We don't dispute that. Well, okay. The skilled nursing facility's contract with PCC forbids the use of bots. Why isn't this a breach of contract every single time you do it? Breach of contract between whom? The SNF and PCC? Yes. PCC has never sued a SNF for purposes of. No, I'm just saying. I go back. It just would jar me when I read that line in your brief. Authorized automatic users. Like, they're actually unauthorized automated users because the only contract that gives you the right to access this information forbids the bots. You have to separate out the words. Authorized means I have authorized access to the information. We're working in a little bit different context than perhaps just using the colloquial sense of the word authorized. Authorized means I have the right to access the patient information.  But just be clear. A necessary implication of your argument is that your client has a right derived from somewhere. Skilled nursing facility's contract with the patient. No, because that contract forbids bots. So your argument must be that you have some sort of right to disregard the terms of the contract between the skilled nursing facility and PCC. And I don't see you arguing that. And maybe you can. Look, people can write all kinds of stuff in contracts that's legally unenforceable. And that's our position, Your Honor. Based on what? You haven't alleged. There's nothing in your submissions that explains to me why that contractual provision is illegal. It's illegal because of, and if we go back to where we started, which is the Cures Act, you can't block. How is it that you're allowed to block the use of automated users, right? They don't block all automated users. So let's be clear about that, Your Honor. That was made clear during the two-day evidentiary hearing. PCC doesn't block every single automated user that goes into its system. They don't use CAPTCHAs. It is, as far as I know. No, that's not true either. Okay. Okay, so we're in the same space. Yep. PCC allows automated users on its system. Tolerates? So I think there's a difference between tolerating something. People tolerate all kinds of things that are not officially allowed. Every day I do. Sure, I'm sure I do too. Yep. But that's not saying that it's allowed. It's saying that people decide that it's not worth it, insisting on strict adherence to all the rules for all the people all the time. Okay, so then why only here in this case when you're dealing with a competitor, when you've reached the non-disclosure agreement, do you come in and enforce a policy you've never enforced before, according to them on the witness stand? Why? It depends. It depends on what? That's a very loyally answered question. Sure, and the way this works is that I ask you questions, you don't ask me questions. It was more rhetorical than anything else. Because where we are is we have a manner exception. Going back to what Judge Wynn said, you have a manner exception. You can't simply ignore that you can export the data as it was requested. We went to them and said, we'll take the data in a data export. We'll take it in a download. We don't ever have to access your system ever again. So why, Judge Hayden, would they not give me the information at that point? Well, let me ask you. Judge Hayden brings up an interesting point when he says, well, you can do it with humans. The contract does. You have to interpret it in light of the Cures Act. And you started out because that earlier question about where do the exceptions come in, and you went to the overarching purpose of the Cures Act. And it seems to me that there could be a question of you could say you can't get it in certain ways, but it offends the Cures Act, because the Cures Act has a greater purpose. And I think all of us, whether we know it or not, probably benefit in some way from the Cures Act, because that's what Congress did. They didn't want people going in a corner doing things and wouldn't share information that would result in what the Cures Act has effectively done. And that is allow probably more people to live in today as a result of the Cures Act, a lot more people. And it's because this whole business, this world we're in now, and we're about to get in another world too, which would be out of this stage. I don't have enough time for that. But that's a whole other story. But this world we're in, in terms of the Cures Act, and that's why I'm struggling with Judge Hayden's point that, well, humans can get it, you can get it, so therefore you meet it. But there has to be some connection in terms of, well, we're with the Cures Act. And if the Cures Act allows this and this is a means to do it, and that's why I brought up the data export, which I do want you to sort of tell me because, and, you know, do it in light of his answer to me on that, because that's important to me. I understand now you do ask for the data export that brings in a marketplace, which is a lot of, I don't know how you limit that. And that might be a consideration. But, you know, it seems to me this whole business of unable to agree and cannot agree, you wouldn't need unable to agree if you could just do cannot agree because you just wouldn't agree. And that's what they did. That's what they did to us. I don't think that's that narrow of an interpretation on it. And that's exactly what they did to us. They came to us and they said, actually, they didn't even say anything. They just stopped negotiating with us and imposed indecipherable captures. I guess that was, you know, what the kids call ghosting or gaslighting or whatever word you want to use. They just, there was nothing further coming from PCC with regard to any type of negotiation over terms. They told us, my way or the highway, here's the agreement. The agreement doesn't apply to this situation. They recognize that, but you've got to sign it anyway. The agreement that they wanted us to sign would not have allowed us to compete with them. How am I supposed to sign an agreement, Your Honors, that says I'm not allowed to compete with them when, in fact, all I do is compete with them? It made absolutely no sense, and yet PCC would not entertain discussions with us to figure out alternative methods. Can I ask you about what I view as their central attack on the district court's legal reasoning that I candidly didn't see a very clear response to in your brief? So let's assume for the sake of argument that the relevant language in the manner exception is cannot reach agreeable terms with the requester. The most important, at least one central question in this case is, what do the words cannot reach agreeable terms with the requester mean? And I view their central argument as being the district court's fundamental error is saying that an unreasonable refusal to agree to reasonable terms proposed by the other side precludes a determination that you can't reach agreeable terms with the requester. And their argument is that is a misinterpretation of what the words cannot reach agreeable terms means. What is your response to that? Because I don't really see a response in your brief to the argument that that is just wrong about what the words cannot reach agreeable terms means. So I don't think I can say it better than Her Honor did, in her opinion, honestly. But to answer your question. What I read her as saying is the district court, excuse me. What I read the district court as saying is they unreasonably failed to agree. Ergo, they cannot say that they cannot reach agreeable terms. But with respect, that is not an argument engaging with what those words mean. It is a factual statement about the world and then an assertion that that factual statement about the world satisfies this definition. Okay. So then I guess we have to go to, well, what does the word cannot mean? Right? That's what you're saying. Cannot reach agreeable terms with the requester. And so their argument is it can't be simply that when the parties do not agree and when one person or side could allege that the other side's refusal to agree was unreasonable, that those words aren't triggered. And they say, well, every time the parties don't agree, it's because they can't reach terms they can both live with. Like, that's literally every failure to agree ever. And you could always say after the fact that one of the sides was being deeply unreasonable. But that's true in every negotiation. Like, if you say I'd like to buy your house for $10,000 and I say no. And you say, but here's a Redfin listing and here's the tax assessment. And your house is actually only worth $9,000. So I'm actually giving you a great deal. And by the way, wouldn't you have lots of great use of that money? And, like, you could prove that you're offering me a 200% premium on the market value of the house. And I can still say no, I don't want to. Okay. Except you just posited an example that does not fall under the Cures Act. No, but you could equally, under the district court's theory, you could equally say the person who insists on receiving a million dollars for their childhood teddy bear, that that would not be a situation where the parties cannot reach agreeable terms about the sale of the teddy bear. And I'm going to disrespectfully disagree with you, Your Honor, because what you're positing has nothing to do with whether or not I am exchanging information at the Cures Act. It has to do with what the words cannot reach agreeable terms mean.  And that's what I asked you. You're putting your thumb on the word cannot. I'm just asking what the words cannot reach agreeable terms mean as a matter of ordinary usage. In ordinary usage, I don't know that I can tell you. In terms of the Cures Act, I can tell you what it means. And here's what it means. If you don't reach a solution under the matter exception, you then turn to 171205 health IT performance exception. And it says that if you can't reach a reason... No, we're not under health IT. We're under the manner exception right now. I'm sorry. I apologize. I went too fast. If you cannot reach an agreement under the manner exception, then you turn to the health IT exception. This is the cross-reference in B1? Or B... They're saying if you can't do that, then a variety of things happen. Right. And that's the variety of things that happen. You've got to move on.  You just don't stop and say...  No, totally. Hands up. We couldn't reach an agreement. We're done. 100% agree. So the fact that that's where they want to stop the discussion and where your example stops is there's nothing further to go to. Well, that's not true. Under the Cures Act, you've got to keep going. The Cures Act doesn't simply allow you to be an electronic health records platform, hold all of the patient's information, and then dole it out on terms that only you think are... I would accept the district court's stop with the meaning of those words. My point is the district court said the way I interpret the words cannot reach agreement, those don't apply. As a result, I don't... So you're right. Maybe, well, you could get this relief under those exceptions because maybe what they did after that is unreasonable. But the district court said I can just cut this whole thing off because they're not eligible for any of that stuff because there wasn't a situation here where the parties cannot reach agreeable terms. Well... That's what the district court said. But the district court actually goes to and discusses the health IT performance exception. She doesn't just... But not in the course of the manner exceptions. Her discussion, the district court's discussion of the manner exception begins and ends with the statement, the parties were not unable to reach agreeable terms. Ergo, the entire manner exception is out the window because it's not triggered in the first place. Let me ask you this. In terms of where Judge Hyten is going with this and you are going back on it and you're using the word cannot, I don't know why it is to me. I think about growing up, you're often admonished for saying can I do something as opposed to may I do something. Fair. And your interpretation is coming more from the may, more from the can, as opposed to may. If it's may, you get permission. You do it. If it's a can, can you do it? Well, if it's idea, yeah, you can do it, but you cannot do it because you won't do it. That's kind of the way I'm seeing you going with this. That you put out a way it can be done, but it cannot be done because you won't do it. And if we're going to go back and forth on that, then I don't see a reason for the first language, as I said, unable, because you do that in every case. I just ain't going to do it. I'm not going to do it. And that's exactly right. And that's exactly what happened here. And is my North Carolina word for that. You can use them all you want, Your Honor. I understand them. So I'm just not sure. My time is up. So if there's no further questions. No, I'm good. I'm good. Thank you. Oh, I'm sorry. Can I ask one other? If I said no. I apologize. No, and that's about, let's put it, because there's this language in your brief where you say, like, okay, put the Cures Act. So there's the question of whether you can get a preliminary injunction or relief for a violation of the Cures Act. I guess there would be a question of whether you could get relief as a matter of Maryland law completely independent of the Cures Act. And then there's a question about whether you could get relief for, like, a blended, like, some Cures Act, some Maryland law. Do you agree the district court's PI in this case that we're currently reviewing is based solely on a violation of the Cures Act? Yes. I don't disagree with that. We put that language in the brief because. No, I understand. Yeah. To preserve it for future proceedings. Yeah, and it's also clear Maryland law doesn't require there to be a statutory violation. Yeah, but it's just we're on the interlocutory appeal of a preliminary injunction. The preliminary injunction is based solely on a violation of the Cures Act, right? No, I don't have a fight with that. Okay. Thank you. You're welcome. All right. Mr. Byland. Thank you. Your Honor, happy to go back to jurisdiction. I just wanted to say at JA-9, their complaint in the title, their complaint, they represent themselves that they're an incorporation. We haven't yet had discovery. I take it from her representations that she's not contesting this jurisdiction, so happy to answer any other questions you have on that. I guess, I think you hit it on the head. We have a contractual prohibition, and the judge recognized that the only way to get around the contractual prohibition if there's some violation of the Cures Act. It's the only thing that could cause that contractual provision not to be satisfied. I mean, the contract provision could conceivably violate Maryland law. I mean, theoretically, of course. Yeah, but the only thing that the district court recognized was a violation of the Cures Act. Yes. And so, because they can't satisfy a violation of the Cures Act, the whole thing falls apart and needs to be set aside. I wanted to, Judge Winn, I wanted to try to be responsive to your concerns. So, when you're within the manner exception, it's not that they don't get what they want. It's just that it has to go through the content and manner standards. See, the basis of it is really not cannot reach an agreement. It's cannot reach agreeable terms. That's the term that's bothering me, is that agreeable term. What the heck is that? I mean, when you think about if you cannot reach an agreement, well, you can't reach an agreement because you won't agree. Correct. But could you reach agreeable terms is really fuzzy. I mean, I don't know what it means. So, to the extent that the court has a concern about that, maybe it's ambiguous. I would point the court to the ONC's explanation of it, and then I would probably rely on Kaiser to defer to the agency. It says, we see actors who are experiencing a problematic level of uncertainty about whether they will be engaging in information blocking if they decline demands from requesters for non-standardized or non-scalable solutions that they do not currently support. And then they make clear that when you offer, and this is at 89 Federal Register, 192 at 1381. And they make clear at that point that you don't have to agree if it's non-standard and it's not scalable, and the alternative you can provide the reasonable alternative. So, I think if there's fuzziness in that language about what it means, I think ONC has cleared it up to say that there's no thumb on the scale that we have to agree with their terms if it's non-standard, non-scalable, and we don't want to agree to it. Do you win if we don't apply any of the exceptions, including the manner requested or the health or the security? If they don't apply, would you win under just the application of the CARES Act? I think that we, well, on our alternative argument, I think we win because it can't be a predicate for Maryland state law claims. If you're asking me if we can't use the part of the definition. Assuming we said it could be, would you win under the CARES Act? If you said it was information blocking, then we would say we would win because the CARES Act can't be a predicate under Maryland law under the tort. And we also had the argument in our brief about the burden of proof being improperly shifted. You've also got a real big swing takings type argument, too, right? So, I think the takings argument is more just a constitutional avoidance argument, right? So, the reason that there's a fees exception and a licensing exception in the CARES Act is so that you're not co-opting our private software. And so, my point is, is if you disrupt that and you're not allowing any, we're not getting any compensation from our TMS. No, I just thought through the implications. I was thinking, like, this was a big thing in the early 2000s, right, about the deregulation of the telecom industry and requiring the legacy carriers to give access. And, like, no one seemed to think that they, well, to the extent they argued that that was unconstitutional, that did not succeed, right? It's true, but they weren't receiving zero dollars, I guess, for unlimited demands on their software. But it's more of a constitutional avoidance argument, not a direct argument. Just to be clear on that, I'm going to leave data exports alone, but just answer this for me. Are you saying you don't support that for any users? By access, Your Honor? No, no, data exports. Do you support the use of that by anybody? Not in the way in which it was described to us on sending CSV files. What I will say is that there was testimony that what we could provide is a data relay where we'd make a copy of all the data and we'd send it to the customer, and then the customer could give that to RTMS. So you're saying there is some method by which you could agree, but it's not this? Yes. So there's a method we could agree, but it puts cost on RTMS, and they want to put all the cost on us. They want us to format the data and send it. They want us to allow by access. What they don't want is us to do a data relay package and send that to their client because that would put a burden on their client. I would refer you to JA 516 where their witness, Chris Miller, said that that would be a burden on their customers. I would also refer you to JA 644 to 645 where our witness talked about how some customers have contracted for this entire amount of data, the follow-up questions at issue, to be exported to the customer, and then RTMS could get it. But, again, they don't want to do that because it doesn't put the cost on us, it puts the cost on them. So there is a benefit, I take it you get, even when they use bots, is they pay for that or not? They don't pay for bot use. They just use it for free. Yes, and it's costing us money. This injunction is costing us money because they're using our server space that then can't be used by our customers. Is that because you all got the same kind of – how does it work? The people that are giving you permission, the patients, you're serving that entity, not your own? If I might answer, I'm out of time. It's sort of parasitic, isn't it? Yeah, they're very parasitic. So we have a contract to provide manual access to nursing homes, and the server space that we have is designed for that manual access. What they're doing is overloading it with bot usage, costs us a lot of money, costs us disruptions, causes outages, and all sorts of issues. And that's why the manner exception exists, to say, look, you get it this other way. And I guess the last thing I would leave you with is the manner exception does have a content. If you look at Part 170, it does have, like, some content restrictions. But to your point, they can get everything, every piece of data through human use. So I'm over time. All right, thank you, Kevin. Thank you, Your Honor. Thank you both, Mr. Bannon and Ms. Bruce.
judges: Roger L. Gregory, James Andrew Wynn, Toby J. Heytens